**Tumery MATHEWS, Plaintiff-Appellant,**

**v.**

**James W. FAIRMAN, Warden, James Thieret, Assistant Warden, and Louis O'Shea, Clinical Services Supervisor, Defendants-Appellees.**

No. 84–1556.

United States Court of Appeals, Seventh Circuit.

Argued June 5, 1985.

Decided Dec. 18, 1985.
Rehearing and Rehearing En Banc Denied March 14, 1986.

Michael T. Brody, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

William D. Fraizer, Asst. Atty. Gen., Chicago, Ill., for defendants-appellees.

Before COFFEY and FLAUM, Circuit Judges, and WRIGHT, Senior Circuit Judge.*

---

COFFEY, Circuit Judge.

The appellant, Tumery Mathews, appeals the entry of a directed judgment in favor of the defendants. Mathews' action, brought pursuant to 42 U.S.C. § 1983, alleged that the defendants deprived Mathews of a constitutionally protected liberty interest without due process of law. We affirm.

I

In 1979, Tumery Mathews was serving a 50–100 year sentence for murder in Pontiac Correctional Center ("Pontiac"). Mathews was assigned a maximum security classification, and consequently resided in the maximum security unit at Pontiac. The maximum security unit housed between 1,600 and 1,700 inmates, with two inmates generally assigned to share a cell. Inmates were only permitted to leave their cells under the escort of a prison official and were allowed one or two showers per week. The maximum security unit housed prisoners with maximum, medium, and minimum security classifications.

Pontiac also maintained a medium security unit, commonly referred to as "the farm." The farm housed approximately 150 inmates with either medium or minimum security classifications. Inmates in the farm were generally assigned one per room. Each inmate was given a key to his room and was permitted to move about the farm unescorted. Although both the maximum security unit and the farm provided recreational equipment and educational opportunities, residents of the farm had greater access to these resources because they enjoyed substantially greater freedom of movement than residents of the maximum security unit.[1]

In early 1979, Mathews applied to the Assignment Committee for a reduction in his security classification and for assign-

---

* The Honorable Eugene A. Wright, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, is sitting by designation.

1. Warden James Fairman testified that in fact there were more educational opportunities and recreational facilities in the maximum security unit than in the farm, but he added that residents of the farm probably had more time for recreation because there were significantly fewer residents in the farm competing for the use of the facilities.

ment to the farm.[2] The Committee approved Mathews' application and he moved to the farm in April 1979. Mathews never received a reprimand or disciplinary charge while he was a resident of the farm.

In December of 1979 two prisoners escaped from the farm. In response to the escape, Warden Fairman ordered an investigation, with the result that prison officials interviewed each resident of the farm. Two days after the escape, Mathews was transferred back to the maximum security unit and was placed in a cell with another inmate. One of the prison officials who executed the transfer told Mathews, "Mat, we know you didn't do nothing, but the Warden said bring you back inside the walls, so you have got to go." Mathews was called before the Assignment Committee, chaired by defendant Louis O'Shea, on January 2, 1980. O'Shea informed Mathews that he had been reassigned to the maximum security unit pursuant to A.R. 802(II)(C)(1) on the basis of a confidential investigation. The vote sheet from the Assignment Committee meeting also disclosed that his transfer was not a disciplinary transfer and therefore no increase in security classification was recommended. The Assignment Committee approved Mathews' transfer, and Mathews' subsequent appeal to the Institutional Inquiry Board was denied. Mathews remained in the maximum security unit at Pontiac until November 1980 when he was transferred to the Menard Correctional Center. He retained his medium security classification for the duration of his time at Pontiac.

Mathews, along with three other prisoners who had been transferred from the farm to the maximum security unit at Pontiac at the same time as Mathews, commenced this lawsuit against James W. Fairman, Warden of the Pontiac Correctional Center, James Thieret, Assistant Warden and Louis O'Shea, Clinical Services Supervisor. The plaintiffs' complaint alleged that their reassignments to the maximum security unit were in violation of A.R. 802, were disciplinary transfers in violation of A.R. 804, violated Illinois statutory provisions, and violated the plaintiffs' right to due process of law. One of the plaintiffs was dismissed before trial for failure to prosecute, and the remaining plaintiffs' case was tried before a jury in March 1984. After plaintiffs presented their case, the district court, *sua sponte*, dismissed the complaint and directed that judgment be entered for the defendants. The district court concluded that the plaintiffs' proof failed to sustain the proposition that the reassignment to the maximum security unit was disciplinary in nature. The district court also concluded, "There is no procedural or substantive due process question that arises in connection with a transfer under A.R. 802" because A.R. 802 in no way limits the discretion of the Administrative Officer to transfer inmates from one segment of the general prison population to another. On appeal, Mathews contends that A.R. 802(II)(C) creates a liberty interest by limiting the discretion of prison administrators to reassign prison inmates and also contends that the trial court erred in not allowing the jury to consider whether his reassignment was disciplinary in nature.

## II

Mathews contends that A.R. 802(II)(C) creates a liberty interest in limiting the discretion of prison officials to reassign inmates. According to Mathews, A.R. 802(II)(C) establishes procedures for establishing an inmate's permanent assignment

---

**2.** The Assignment Committee, comprised of three members of the prison staff, designates residential and work assignments at Pontiac. Administrative Regulation ("A.R.") 802 provides that an inmate shall appear before the Assignment Committee within sixty days after arrival at Pontiac to receive a permanent assignment. After receiving a permanent assignment, that inmate may petition the Assignment Committee

for a change in either assignment or security classification. The Assignment Committee considers a number of factors in evaluating the inmate's request for change in assignment. For example, the Committee would consider the inmate's current and prior offense records, disciplinary adjustment, and the inmate's performance with respect to job duties and work assignments.

and provides that a change in assignment may be made for three reasons only: (1) the inmate's inability or incompetence in completing a work, training or study assignment; (2) an inmate's violation of a rule after the inmate has been adjudged guilty in accordance with the provisions of A.R. 804 [3]; or (3) placement in segregation under the provisions of A.R. 804. Mathews construes A.R. 802(II)(C)(1), cited by the Assignment Committee as the basis for Mathews' reassignment, to permit changes in assignment only for work-related problems. Since there was no evidence that Mathews had any problems in completing work assignments, he contends that the provision does not justify his reassignment to maximum security. Further, Mathews argues that A.R. 802(II)(C)(2) & (3) permit the reassignment of an inmate only when the prison officials have acted in compliance with A.R. 804.

The defendants argue to the contrary that A.R. 802 does not implicate any constitutionally protected liberty interest. Unless the regulation expressly justifies the expectation on the part of a prisoner that "transfer [would] occur only on the occurrence of certain events," the state has not created a constitutionally protected liberty interest. According to the defendants, to create a constitutionally protected liberty interest, the state must do more than create a procedural structure but must employ clear, mandatory language and provide that the action in question will not occur absent "specified substantive predicates." Thus, the defendants urge that a state regulation does not create a liberty interest unless it clearly limits the discretion of the prison officials. The defendants construe A.R. 802(II)(C)(1) as placing no limit on an Illinois prison official's discretion to reassign a prisoner. We intially note that the Supreme Court has recognized "that prison officials have broad administrative and discretionary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interests." *Hewitt v. Helms,*

459 U.S. 460, 467, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). "Prison administrators ... should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). "Liberty interests protected by the Fourteenth Amendment may arise from two sources—the Due Process Clause itself and the laws of the States," *Hewitt,* 459 U.S. at 466, 103 S.Ct. at 868, but "to hold ... that *any* substantial deprivation imposed by prison authorities triggers the procedural protections of the Due Process Clause would subject to judicial review a wide spectrum of discretionary actions that traditionally have been the business of prison administrators rather than of the federal courts." *Id.* (emphasis original) (quoting *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976)). Thus, the Supreme Court has:

"consistently refused to recognize more than the most basic liberty interests in prisoners. 'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1060, 92 L.Ed. 1356 (1948). Thus, there is no 'constitutional or inherent right' to parole, *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979), and 'the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison,' *Wolff v. McDonnell, supra,* 418 U.S. [539], at 557, 94 S.Ct. [2963], at 2975 [41 L.Ed.2d 935 (1974)], despite the undoubted impact of such credits on the freedom of inmates. Finally, in *Meachum v. Fano, supra,* 427 U.S., at 225, 96 S.Ct., at 2538, the transfer of a prisoner from one institution to another was found unprotected by 'the Due Process Clause in an of itself,' even

---

**3.** A.R. 804 establishes procedures for the administration of discipline.

though the change of facilities involved a significant modification in conditions of confinement, later characterized by the Court as a 'grievous loss.' *Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976). As we have held previously, these decisions require that '[a]s long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight.' *Montanye v. Haymes*, 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976). *See also Vitek v. Jones*, 445 U.S. 480, 493, 100 S.Ct. 1254, 1263, 63 L.Ed.2d 552 (1980)."

*Hewitt*, 459 U.S. at 467–68, 103 S.Ct. at 869–70. Thus, "it is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence," and thus does not implicate a prisoner's liberty interest under the Due Process Clause. *Hewitt*, 459 U.S. at 468, 103 S.Ct. at 869. Thus, Mathews could not and in fact does not contend that a nonpunitive assignment to maximum security implicates a liberty interest under the Due Process Clause. Instead, Mathews urges that A.R. 802 "limits the discretion of prison officials to reassign an inmate once the inmate has been permanently assigned. By so limiting the discretion of prison authorities, A.R. 802 creates a protectible liberty interest."

In *Hewitt v. Helms*, the Supreme Court examined Pennsylvania's statutes and regulations governing the transfer of an inmate from the general prison population to administrative segregation. The Court noted that Pennsylvania "used language of an unmistakenly mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that administrative segregation will not occur absent specified substantive predicates—viz., 'the need for the control,' or 'the threat of a

serious disturbance.' " *Hewitt*, 459 U.S. at 471–72, 103 S.Ct. at 871–72. The Court was "persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." *Id.* at 472, 103 S.Ct. at 871.

This court has clearly recognized that the Administrative Regulations of the Illinois Department of Corrections establishing purely procedural guidelines that do not limit the exercise of officials' discretion do not create a protected liberty interest. In both *Shango v. Jurich*, 681 F.2d 1091 (7th Cir.1982), and *Harris v. McDonald*, 737 F.2d 662 (7th Cir.1984), we held that A.R. 819 governing institutional transfers of inmates failed to create a protectable liberty interest. A.R. 819 provided that "[a] hearing will be scheduled;" that "[t]he reasons for the transfer shall be reviewed with the resident;" and that the resident "[w]ill be allowed to present information and/or evidence which would tend to support or refute the transfer." In *Shango*, we reaffirmed the holding of *Chavis v. Rowe*, 643 F.2d 1281, 1290 (7th Cir.), *cert. denied sub nom., Boles v. Chavis*, 454 U.S. 907, 102 S.Ct. 415, 70 L.Ed.2d 225 (1981), that A.R. 819 "establish[ed] procedures for the exercise of discretion, *but they do not limit the decision to transfer to any particular reason. Without such a limitation, the regulations do not recognize any right on the part of the prisoner to serve in a particular institution.*" 681 F.2d at 1100 (emphasis original). The court in *Shango* also noted that A.R. 819 placed no limit on a prison official's unfettered discretion to transfer a prisoner "for whatever reason or for no reason at all," and thus created no protected liberty interest. *Id.* Likewise in *Harris*, we held that standing alone, the explicit language mandating the procedures for prison officials to follow in transferring an inmate to another prison was "insufficient to create a liberty interest." 737 F.2d at 665.

Furthermore, in *Shango*, we characterized as "analytically indefensible" the argu-

ment that "the procedures established by the regulations can themselves be considered a liberty interest," 681 F.2d at 1100, and recognized that "a state created procedural right is not itself a liberty interest within the meaning of the Fourteenth Amendment." *Id.* at 1101. The court in *Harris,* following the reasoning of *Shango,* concluded that the Illinois Department of Corrections did no more than establish "simple procedural guidelines" in promulgating A.R. 819. *Harris,* 737 F.2d at 665.

█ Mathews relies on A.R. 802(II)(C)(1), providing:

> "After a permanent assignment has been made, a resident may, for inability or incompetence in completing a work, training or study assignment, upon the written recommendation of the staff supervisor, be removed from the assignment and reassigned by the Assignment Supervisor, with approval of the Assistant Warden for Operations or Program without convening the full Committee. However, a full Committee hearing shall be provided if requested by the resident when he/she believes such removal should receive consideration by the full Committee."

We initially note that since Mathews cites no Illinois statute as limiting the prison officials' discretion to reassign inmates, he is relying on A.R. 802. But in *Hewitt,* the Supreme Court stated that protected liberty interests may arise from two sources, "the Due Process Clause itself and the *laws* of the States," 459 U.S. at 466, 103 S.Ct. at 868 (emphasis added), and examined Pennsylvania *statutes* and regulations in concluding that the inmate in *Hewitt* acquired a protected liberty interest. Since Mathews has failed to provide any statutory authority even arguably creating a protected liberty interest, we fail to comprehend how one can argue that A.R. 802 standing alone can create such a protected liberty interest. Furthermore, two reported district court decisions have construed A.R. 802 as imposing no limitation upon the discretion of prison officials in changing work assignments or security classifica-

tions. *See Watts v. Morgan,* 572 F.Supp. 1385, 1391 (N.D.Ill.1983); *Larson v. Mulcrone,* 575 F.Supp. 1, 3 (N.D.Ill.1982), *aff'd,* 723 F.2d 914 (7th Cir.1983). It is obvious that in the absence of imperatives such as "shall," "will," or "must," the language of A.R. 802(II)(C)(1) cannot be considered as "unmistakenly mandatory [in] character." In comparing the language of A.R. 802(II)(C)(1) with the language of A.R. 819, we note that A.R. 819 employs the terms "shall" and "will" in establishing the procedures governing the transfer of an inmate, while A.R. 802(II)(C)(1) states, "a resident *may,* for inability or incompetence in completing a work, training or study assignment, upon the written recommendation of the staff supervisor, be removed from the assignment and reassigned by the Assistant Supervisor...." (emphasis added). Since this court held in *Shango* and *Harris* that A.R. 819, employing the terms "shall" and "will," placed no limit on prison officials' discretion to transfer a prisoner, A.R. 802(II)(C)(1), employing the term "may," language of a less mandatory character than "shall" or "will," clearly cannot be construed as placing any limit on prison officials' discretion to reassign inmates within the prison. Furthermore, similar to our finding in *Shango* and *Harris* with respect to A.R. 819, we conclude that A.R. 802(II)(C)(1) does not promise that reassignment will not occur absent specific substantive predicates. A.R. 802(II)(C)(1) thus places no limit whatever on the prison official's discretion to reassign inmates within the institution. The Illinois Department of Corrections, which promulgated A.R. 802, had every opportunity to employ such mandatory language in the regulation, but chose not to do so. At most, the regulation establishes procedural guidelines for the reassignment of an inmate who lacks the ability or competence to complete a work, training, or study assignment. "[B]ut a state created procedural right is not itself a liberty interest within the meaning of the Fourteenth Amendment." *Shango,* 681 F.2d at 1101.

Mathews contends that an inmate can be reassigned pursuant to A.R. 802 only if he

is unable to satisfactorily complete the assignment, if he is adjudged guilty of a rule violation, or if he is placed in segregation status. Mathews' construction of A.R. 802 ignores the reality that prison officials must have broad discretion to reassign inmates to meet the needs of the institution, even if the inmate is satisfactorily completing his current assignment. "Prison officials must be free to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape or unauthorized entry," *Wolfish*, 441 U.S. at 547, 99 S.Ct. at 1878, and prison administrators must be "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* Thus, we hold A.R. 802(II)(C)(1) does not create a protectable liberty interest under the Fourteenth Amendment.

### III

Mathews also contends that the district court erred in not allowing the jury to decide whether the defendants' reassignment of Mathews to the maximum security unit was a disciplinary action. He urges that Ill.Rev.Stat. ch. 38 § 1003–8–7(b)(2), A.R. 802(II)(C)(2) and A.R. 804 prohibit the imposition of disciplinary measures without due process. Mathews also argues that sufficient evidence was presented to the court to permit a jury to conclude that the defendants' action was in fact disciplinary in nature. The defendants counter that all of the circumstances surrounding Mathews' transfer demonstrate that the action was administrative in nature and not disciplinary.

When considering the grant of a directed verdict:

"The trial court must view the evidence and make all inferences in the light most favorable to the non-moving party, and ... if reasonable jurors could differ on the conclusions drawn therefrom, the case must go to the jury. [It is] clear that the trial judge must determine whether the party with the burden of proof has produced sufficient evidence upon which a jury could properly proceed to a verdict, and that a mere scintilla of evidence will not suffice. Thus on appeal the party against whom a verdict has been directed has the onus of demonstrating the existence of a conflict in the evidence or the inferences to be drawn therefrom sufficient to justify submission of the question to the jury."

*Richardson v. City of Indianapolis*, 658 F.2d 494, 498 (7th Cir.1981), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982) (citations omitted). In determining whether a prison official's action is disciplinary in nature, this court has previously distinguished between "what is essentially a predictive decision based on assessment of a prisoner's entire institutional record and a decision in response to a specific rule infraction." *Shango*, 681 F.2d at 1103 n. 3. Thus, we must determine whether Mathews produced sufficient evidence upon which a jury could properly find the defendants' action in reassigning Mathews to the maximum security unit to be "a decision in response to a specific rule infraction."

We turn to the evidence introduced at trial. Mathews introduced in evidence a memorandum dated November 9, 1979 from a Lieutenant Beach to a Captain Tollensdorf, both of the prison staff. The memorandum disclosed that Warden Fairman and Assistant Warden Thieret received copies of the memorandum. The memorandum also disclosed that an inmate overheard a conversation between Michael Briseno (one of the original plaintiffs in this action) and another inmate stating that if Briseno did not make parole, he, along with Mathews and two other inmates were going to escape from the farm. Warden Fairman testified that he took no action with respect to the inmates mentioned in the memorandum because "we did not want to remove four inmates from a medium security [sic] back inside the walls...." Fairman also testified that following the escape of two inmates from the farm in mid-December he conducted a review of

security at the farm, and discovered that there was construction underway on the farm, that a mound of dirt obstructed the view from a guard tower to the area where the two inmates escaped, and that a certain section of the fence was not very well lit. Fairman further testified that escapes "usually come in rashes" because of a problem with security. He stated:

> "[Y]ou have to move the people in until you can get those changes effectuated to the point that you feel comfortable with putting this type of inmate out on a medium security at Pontiac. It is not a regular medium security unit in that it does not have a double fence with a rec wall about two feet deep, also, which is what the other medium security facilities in Illinois have. So you have to take extraordinary precautions in that facility."

According to his testimony, Fairman had insufficient information to bring disciplinary charges against Mathews for complicity in the escape of the two inmates in mid-December. In fact, Fairman stated that he did not bring Mathews back in to the maximum security unit because of any involvement in the December escape, but instead because he believed the transfer to be in the best interest of Pontiac.

Mathews testified that when he was transferred from the farm, a guard said to him, "we know you didn't do nothing, but the warden said bring you back inside...."

The record reveals no evidence of any disciplinary proceedings instituted against Mathews. Further, the evidence from the hearing before the Assignment Committee reveals that Mathews' transfer was administrative rather than disciplinary. A memorandum dated December 21, 1979, from Warden Fairman to Louis O'Shea, Chairman of the Assignment Committee, stated, "due to concerns relative to the safety and security of [Pontiac] you are instructed to reassign [Mathews] in accordance with A.R. 802(II)(C)(1)...." As a result of his reassignment, Mathews was provided a hearing before the Assignment Committee; the Assignment Committee has no disciplinary function, but is concerned only with the administration of A.R. 802. Finally, the vote sheet from Mathews' hearing before the Assignment Committee revealed that Mathews was advised that his was not a disciplinary transfer and therefore, no increase in security classification was recommended.

 It is evident to this court from the facts adduced at trial that Mathews has not produced sufficient evidence upon which a jury could properly find that Mathews' reassignment from the farm to the maximum security unit was a disciplinary action in response to a specific rule infraction. Rather, the evidence clearly demonstrates that Warden Fairman's decision to transfer Mathews came only after an escape had revealed serious shortcomings in security at the farm. Thus, Mathews' transfer was "essentially a predictive decision" based on an assessment of Mathews' institutional record and the best interests of the institution. Consequently, we hold the district court's direction of judgment in favor of the defendants was not error.[4]

## IV

The decision of the district court is AFFIRMED.

---

**4.** The plaintiffs cite *Reese v. Sparks,* 760 F.2d 64 (3d Cir.1985), for the proposition that whether a transfer is administrative or disciplinary is an issue of fact to be decided by the jury. *Reese,* however, was before the district court on a motion for summary judgment, and the Third Circuit held that the existence of a genuine issue of material fact precluded the entry of summary judgment. In the case before us, the plaintiff, Mathews, presented his entire case to the court. "Once the parties have introduced their evidence, a directed verdict may be proper where summary judgment was not." *Parfait v. Central Towing, Inc.,* 667 F.2d 1189, 1191 (5th Cir.1982).

"No longer was the question simply whether there were disputed issues that might affect the result. Instead the trial judge was entitled to weigh the evidence to determine whether it sufficed to support a verdict." *Nunez v. Superior Oil Co.,* 644 F.2d 534, 535 (5th Cir.1981). Thus, although a genuine issue of material fact may have existed in the case at bar so as to preclude the entry of summary judgment, where, as here, the plaintiff has failed to marshall sufficient evidence to support a jury finding in its favor, the entry of a directed verdict is entirely appropriate.