**Elijah BAPTIST, Plaintiff,**

v.

**Michael O'LEARY, Thomas Roth and Thomas Morris, Defendants.**

**No. 88 C 4666.**

United States District Court,
N.D. Illinois, E.D.

July 11, 1990.

---

John L. Sullivan, Chicago, Ill., for plaintiff.

John A. Simon, Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Elijah Baptist ("Baptist") has sued Stateville Correctional Center ("Stateville") Warden Michael O'Leary ("O'Leary") and other officials of the Illinois Department of Corrections ("Department") under 42 U.S.C. § 1983 ("Section 1983"), seeking damages for alleged violations of Baptist's Fourteenth Amendment right to due process in connection with Baptist's reassignment from one prison job to another while an inmate in Stateville. Defendants have moved for summary judgment under Fed. R.Civ.P. ("Rule") 56, claiming:

1. their actions did not violate Baptist's due process rights and

2. they are immune from suit.

For the reasons stated in this memorandum opinion and order, this Court rejects defendants' effort to dispose of the case as a matter of law on the first of those contentions,[1] but it grants defendants' motion on qualified immunity grounds.

### Facts [2]

Before March 24, 1988 [3] Baptist was incarcerated in "the Farm," a Minimum Security Unit outside the main walls of Stateville, and held a manual labor job as an assistant to the prison's Chief of Engineering. That job was also located outside the main prison walls in Stateville's Administration Building, where prison officials employed about 21 minimum security inmates (including Baptist). Equipment used by inmates on the job was kept in the Inventory Control office in the Administration Building.

On March 22 a Department employee discovered that the Inventory Control office was missing one of the two portable engravers that Department used to inscribe identifying numbers on any object worth more than $100 brought into Stateville. When the apparent theft was brought to the attention of Assistant Warden (and defendant here) Thomas Roth ("Roth"), he met with O'Leary and they agreed on a

---

1. Defendants are wrong on the law, and the presence of a factual issue would foreclose any disposition short of trial on that issue.

2. Familiar Rule 56 principles impose on the movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). For that purpose this Court is called on to draw all "reasonable inferences, not every conceivable inference" in the light most favorable to the nonmovant—in this case Baptist (*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,* 811 F.2d 326, 329 (7th Cir. 1987)).

3. All further references to dates without any year designation also refer to 1988.

plan to flush out the culprit. Roth had Department employee (and third co-defendant) Thomas Morris ("Morris") call together all inmates working in the Administration Building for a talking-to. At that gathering Roth told the inmates that an engraver was missing and that Department wanted it back. He asked any inmate with information as to its whereabouts to share it with him or any other Department employee and said that if the engraver had not been recovered by a certain day [4] all the inmates in the room would be reassigned to jobs outside the Administration Building.

No one snitched, and Department is looking for the elusive engraver to this day. After the deadline had passed without the engraver turning up, Roth and Morris consulted with other Department staff members and determined that the engraver would have been accessible to any inmate working in the Administration Building and that none of the inmates was beyond suspicion. Thereafter Roth, with O'Leary's approval, had Morris direct the MSU Assignment Committee to reassign all the inmates who had been working in the Administration Building to jobs outside the Administration Building.

Baptist was never individually accused of stealing or having anything to do with the loss of the engraver. Nevertheless, on March 29 he was reassigned to D-line, a work group that was then performing construction and demolition work on structures in and around the prison grounds. All other inmates who had worked in the Administrative Building were similarly reassigned.[5]

Shortly after being reassigned to D-line, Baptist filed an administrative grievance with the Stateville Institutional Inquiry Board, claiming the constitutional violations he asserts here. After his grievance was heard and rejected by that body, he appealed to the Administrative Review Board, which upheld that rejection. Baptist's administrative review opportunities were exhausted when Department Director Michael Lane signed the Board's letter to

---

**4.** Baptist's Amended Complaint alleges that the meeting between Roth, Morris and the inmates occurred on March 24, that Roth set the next day as the deadline for coming forward with information and that Baptist was reassigned on the deadline date—March 25. Defendants' statement of uncontested facts supporting their motion for summary judgment—filed pursuant to this District Court's General Rule ("GR") 12(m) —gives no date for the meeting or for the deadline and says that Baptist was reassigned March 29 to begin his new job March 30. Although precise dates are not material to the current motion, GR 12(n) provides for this Court to deem such facts admitted where, as here, the party opposing the motion fails to respond to them. But there is no need to apply that deemed-admission concept here, for the parties' statement of uncontested facts in the Final Pretrial Order entered by this Court January 29, 1990 confirms March 29 as Baptist's reassignment date.

**5.** Actually, P.Mem. 13 now claims that one of the inmates was not reassigned out of the Administration Building, contending that such difference in his treatment undermines defendants' claim to have acted for security reasons. In support Baptist points to a list of inmates reassigned on March 29 that indicates an inmate Johnson had been removed from his assignment in the Administration Building "PER ASST. WARDEN ROTH," as had the others, and

originally reassigned to A-line, but then had that assignment scratched out by hand and replaced with "Officers' Weight Room 3–11," which Baptist claims is also in the Administration Building. Even granting that one inmate might have been moved to another job within the Administration Building, Baptist has failed to suggest how that makes defendants' security rationale any more or less likely. Rather, it seems the appropriate reasonable inference to be drawn from that fact is that defendants made good on their threat to reassign all 21 inmates and then, before Johnson actually reported to A-line, made an individualized determination that assigning Johnson to the Officers' Weight Room would satisfy their security concerns—the same kind of individualized determination that ultimately led to Baptist's reassignment to work in the Officers' Dormitory (see n. 6). It is worth noting that the 21 inmates all held assignments designated "ADM. BLDG. 7–3" before reassignment, and that there is no evidence (other than Baptist's sheer speculation) to suggest that an assignment to "Officers' Weight Room 3–11" would carry with it security concerns comparable to those that defendants viewed as having been posed by the prior "ADM. BLDG. 7–3" assignments. To put the matter in terms of the relevant Rule 56 standards (see n. 2), there is no reason to infer from defendants' treatment of inmate Johnson any lack of credibility in defendants' claim that they were motivated by security-based concerns.

Baptist to indicate his concurrence with the Board's rejection of the grievance. Baptist now asks this Court to find that his reassignment to D-line violated his right to due process because made without the procedural safeguards normally attendant to disciplinary discharges from prison jobs.[6]

### Constitutional Violation

█ Baptist's lawsuit invokes the Fourteenth Amendment's guarantee of due process of law before an individual is deprived of "life, liberty or property": He claims the deprivation without due process of a property or liberty interest in holding a job in the Administration Building while a Stateville inmate. Accordingly the first question is whether Baptist's reassignment violated any property or liberty interest protected by the Constitution.

That of course calls for an initial definitional decision—after all, the Constitution does not by its terms grant inmates a protectible interest in prison employment as such (see, e.g., *Garza v. Miller*, 688 F.2d 480, 485–86 (7th Cir.1982)). In addition, not every violation of state law brings into play the panoply of constitutional protections. But inmates do not surrender all their liberty interests at the jailhouse door (see, e.g., *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 1908–09, 104 L.Ed.2d 506 (1989)), and state statutes and regulations may create interests to which the constitutional protections attach. As the operative principles were recently summarized in *Russ v. Young*, 895 F.2d 1149, 1153 (7th Cir.1990), quoting *Hewitt v. Helms*, 459 U.S. 460, 471–72, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983) and *Kentucky Department of Corrections*, 109 S.Ct. at 1910:

> To create a constitutionally protected liberty interest, a state must employ "lan-

guage of an unmistakably mandatory character, requiring that certain procedures 'shall,' 'will,' or 'must' be employed ... and that [the challenged action] will not occur absent specific substantive predicates...." In other words, a liberty interest is created only where the state regulation in question contains "specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow...."

Baptist first argues that his reassignment out of the Administration Building violated the Illinois statute relating to disciplinary actions against prison inmates, Ill. Rev.Stat. ch. 38, ¶ 1003–8–7(e):[7]

> In disciplinary cases which may involve the imposition of a disciplinary isolation, the loss of good time credit or eligibility to earn good time credit, or a change in work, education, or other program assignment of more than 7 days duration, the Director shall establish disciplinary procedures consistent with the following principles:
>
> (1) Any person or persons who initiate a disciplinary charge against a person shall not determine the disposition of the charge. The Director may establish one or more disciplinary boards to hear and determine charges. To the extent possible, a person representing the counseling staff of the institution or facility shall participate in determining the disposition of the disciplinary case.
>
> (2) Any committed person charged with a violation of Department rules of behavior shall be given notice of the charge including a statement of the misconduct alleged and of the rules this conduct is alleged to violate.
>
> (3) Any person charged with a violation of rules is entitled to a hearing on

---

6. On April 28 Baptist was reassigned back to a job outside the prison walls (although apparently not in the Administration Building) as janitor in the Officers' Dormitory after filing an application for the posted position. If Baptist's initial reassignment out of the Administration Building amounted to a constitutional violation, his later change of assignment to a job he wanted would not moot his claim for damages.

7. Further references to sections of chapter 38 of the Illinois Revised Statutes will simply take the form "Section—." That usage comports with the Illinois General Assembly's use of that word and of the symbol "§" in its enactments, even though the publisher of the Smith–Hurd annotated version of the Illinois statutes has chosen to shift to "¶" instead.

that charge at which time he shall have an opportunity to appear before and address the person or persons deciding the charge.

(4) The person or persons determining the disposition of the charge may also summon to testify any witnesses or other persons with relevant knowledge of the incident. The person charged may be permitted to question any person so summoned.

(5) If the charge is sustained, the person charged is entitled to a written statement of the decision by the persons determining the disposition of the charge which shall include the basis for the decision and the disciplinary action, if any, to be imposed.

(6) A change in work, education, or other program assignment shall not be used for disciplinary purposes except as provided in paragraph (b) of this Section and then only after review and approval under Section [1003-8-3].

Section 1003-8-7(b), referred to in the just-quoted subparagraph 7(e)(6), provides in part:

(2) Disciplinary restrictions on visitations, work, education or program assignments, and the use of the prison's library shall be related as closely as practicable to abuse of such privileges or facilities. This paragraph shall not apply to segregation or isolation of persons for purposes of institutional control.

Finally, Section 1003-8-3 directs that work assignments be made "in so far as practicable" in accordance with the social evaluation that Section 1003-8-2 requires to be made for each inmate.

Section 1003-8-7(e) establishes a set of principles pursuant to which Department "shall" promulgate rules for disciplinary proceedings. In so doing, it is uncompromising in its mandate as to what Department may *not* do: Among other things, Department may not punish an inmate with a change in work assignment of more than 7 days' duration without providing the inmate with notice, a hearing before a deciding officer other than the officer initiating the charge, an opportunity to question witnesses and a written explanation of the decision. Because he has claimed that defendants punished him by reassignment without giving him the benefit of any of those mandatory procedures, Baptist has cleared the initial hurdle of asserting a constitutionally protected liberty interest.[8]

In addition to asserting a liberty interest, Baptist must also show a deprivation of that interest without due process of law. On that score Baptist's claim turns on his belief that his reassignment was indeed a disciplinary action for the suspected theft of the engraver.[9] Defendants argue to the

---

**8.** D.Mem. 7 cites *Culbert v. Young,* 834 F.2d 624 (7th Cir.1987), *Mathews v. Fairman,* 779 F.2d 409 (7th Cir.1985) and *Watts v. Morgan,* 572 F.Supp. 1385 (N.D.Ill.1983) for the proposition that:

Courts in this circuit have held Illinois statutes and prior regulations governing prison work assignments do not contain language of an unmistakably mandatory character so as to impose a substantive limit on official discretion.... Although the regulations cited in those cases have since been superseded, the new regulations do not create substantive limits on official discretion in inmate job assignments.

Those cases are really inapposite here. *Culbert,* 834 F.2d at 625 involved Wisconsin prison regulations governing the classification of disciplinary violations committed in prison as major or minor, a task committed (in the respects relevant to that case) to the discretionary judgment of the prison's security director (*id.* at 627-29). And although *Mathews,* 779 F.2d at 414-15 and *Watts,* 572 F.Supp. at 1388-91 did involve Illinois regulations bearing on issues with some superficial similarity to those confronting this Court, there are at least two critical (and dispositive) distinctions that belie the applicability of defendants' above-quoted proposition to this case:

1. Neither case addressed the mandatory provisions of Section 1003-8-7(e) for *disciplinary* transfers.

2. Each of those decisions was expressly based on a determination that the reassignment at issue was *not* punitive (*Mathews,* 779 F.2d at 415-16; *Watts,* 572 F.Supp. at 1389-90). Neither case said that an actually punitive reassignment would not implicate an inmate's liberty interests.

**9.** If that were so, this Court need not hold that the Section 1003-8-7(e) procedures (which were concededly not followed before implementing Baptist's reassignment) are a complete match for the minimum requirements of the Due Process Clause. Instead the relevant question—essentially whether a predeprivation hearing

contrary. They say the reassignment was a purely administrative reassignment governed by Department Rule § 420.40(a), which grants Department unfettered discretion to make reassignments:

> A committed person may be removed from his assignment and/or reassigned by the Chief Administrative Officer or his designee.

They claim that the statutory protections afforded inmates facing disciplinary reassignments apply only where a formal "disciplinary charge" is brought against the inmate. Because Baptist admits that he was never individually charged with misconduct, defendants conclude that he was not entitled to any of the protections of Section 1003–8–7(e).[10]

That reading of Section 1003–8–7(e) and the Due Process Clause will not fly. It would leave the door wide open for a wholly pretextual script, in which prison officials could first decide to effect a punitive reassignment, then shield that decision from review by simply declining to level formal charges against the inmate. If courts were to sign on to that reading, prison officials could evade the statute (and hence the Due Process Clause) altogether by thus silently punishing inmates without charge or any kind of hearing, insulating the officials' actions from challenge by hiding behind the power to make employment decisions. Although some prison officials might wish they enjoyed such wide latitude, this Court will not so lightly eviscerate the protections that the Illinois legislature so clearly intended that Section 1003–8–7(e) would afford to inmates before they could be punished—and, having done so, thus conferred due process rights on the inmates.

As a fallback position defendants argue that even if Baptist had been reassigned as a disciplinary measure, he was afforded all the process he was due in the "hearings" by which the Institutional Inquiry Board and Administrative Review Board heard and denied his grievance. Without reaching the issue whether the procedures those two Boards employed in reaching their decisions met the requirements of due process—neither party's briefs have addressed in any substantive way either (1) what procedures those bodies used or (2) what procedures constitute due process under the circumstances—the proceedings before those Boards are simply irrelevant to Baptist's constitutional claim. Baptist's claim is not that he got *no* hearing, because Section 1003–8–7(e)(3) does not require just any old hearing. Baptist claims he never got the kind of hearing that section requires: a hearing *on the charge* for which he was allegedly punished—for stealing the engraver. According to the record thus far established, Baptist's hearings before the Institutional Inquiry and Administrative Review Boards inquired only into whether Baptist's reassignment had been punitive or administrative. By deciding it was administrative those Boards avoided ever reaching the issue on which the statute requires the hearing: whether Baptist did anything wrong to justify his reassignment.

It has thus been established that Baptist was entitled in due process terms to a hearing if he was reassigned for punitive reasons. That leaves the question—one of fact—whether his reassignment was indeed punitive. Any answer to that question must rest on a determination of defendants' intent—always a difficult inquiry—when they reassigned all 21 inmates to other jobs around the facility. Baptist claims it was to punish all for the actions of one (or a few). Defendants insist it was to maintain the security of the Administration Building—a goal of no mean importance. On the issue whether defendants *in*

---

would be feasible (see *Zinermon v. Burch*, —— U.S. ——, 110 S.Ct. 975, 987, 108 L.Ed.2d 100 (1990)) is conclusively answered in the affirmative by the Illinois General Assembly's decision as embodied in the statute (*id.* at 989).

**10.** To put the matter more precisely in due process terms, the earlier discussion in the text makes it clear that no liberty interest is implicated by a job transfer where the decisionmaker is not subject to a statutory or regulatory mandate—one that permits such a transfer only if specified substantive predicates have first been found to exist.

*fact* violated Baptist's rights, therefore, this case would boil down to a classic genuine issue of material fact that would have to be determined at trial.

### Qualified Immunity

■ No such trial will be necessary here, though, because defendants must prevail on their affirmative defense of qualified immunity. As *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) has made clear, government officials are granted immunity from many suits for damages arising out of their performance of their duties "to shield them from undue interference with their duties and from potentially disabling threats of liability" (*id.* at 806, 102 S.Ct. at 2732). Defendants argue that because plaintiffs can cite to no case giving prisoners the right to the protections of Section 1003–8–7 where no formal disciplinary charge has been leveled, their actions did not violate any of Baptist's "clearly established" rights and they are therefore immune from suit.

Before its reformulation in *Harlow,* the qualified immunity defense had two prongs—one subjective and one objective. Under the subjective prong an official's immunity could be lost if he or she "took the action with the malicious intention to cause a deprivation of constitutional rights or other injury" (*Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975)). *Harlow* eliminated that subjective prong, however, and the post-*Harlow* rule for qualified immunity is this (457 U.S. at 818, 102 S.Ct. at 2738 (citations omitted)):

> We therefore hold that government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

To apply that standard, this Court must first define the right that defendants' actions are alleged to have violated. *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987) (citations and footnote omitted) underscores the importance of that inquiry:

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

In light of those concerns, it is not enough to say as Baptist does that his right under Section 1003–8–7(e) to certain proce-

dures prior to disciplinary reassignment was clear on the face of that statute—from which it would follow that any such reassignment absent those procedures violated clearly established law. Rather, the impermissible level of abstractness—the matter that would not satisfy the "clearly established" standard—is a function of whether defendants' *conduct* violated Baptist's "clearly established" rights. Hence the issue is whether an objectively reasonable prison official should have known that Baptist's reassignment would, under the circumstances, implicate Section 1003–8–7(e) at all.

It might be tempting to say that an answer to that question must await resolution of the factual issue whether defendants actually used the administrative reassignment on "security" grounds as a pretext for discipline—it would, after all, seem anomalous to hold that an objectively reasonable person could intend to hide a subjectively disciplinary action by asserting a pretext, while simultaneously being ignorant to whether his or her actions were indeed disciplinary. But that seeming anomaly is the law. To prevent lengthy discovery into the state of mind of defendant officials, *Harlow* barred inquiry into the specific defendant's actual intent as long as a hypothetical public official in the same circumstances could reasonably have believed that his or her actions were lawful.[11] In *Anderson*, 483 U.S. at 641, 107 S.Ct. at 3039 the court held that a law enforcement officer who mistakenly concluded that probable cause existed to conduct a warrantless search would be immune regardless of his subjective beliefs about the search if "a reasonable officer could have believed [the] warrantless search to be lawful." [12]

Given that claim, two questions present themselves: (1) whether prison officials could reasonably have had security purposes in mind when they made the reassignments and (2) whether under the circumstances such officials could reasonably have believed that they could accomplish a mass reassignment of inmates for security purposes without invoking the procedures of Section 1003–8–7. Neither question demands extended treatment to demonstrate that each gets an affirmative answer.

As to the first, Baptist has suggested no reason to believe that defendants' asserted motive was implausible or unreasonable. Baptist questions defendants' reliance on security reasons by noting that within one month of his assignment out of the Administration Building he was reassigned to the Officer's Dormitory, another job that would give Baptist access to items belonging to officers that would also raise serious

**11.** This is really the qualified-immunity equivalent of the reasonable man (or reasonable woman) test in the tort law of negligence.

**12.** Our Court of Appeals recently demonstrated the lengths to which that principle could be taken, and it may be about to take a second look at that issue. In *Auriemma v. Rice*, 895 F.2d 338 (7th Cir.1990) former Chicago Police Superintendent Fred Rice was alleged to have reorganized the top management positions in the Chicago police department solely on the basis of the race of the officers in those positions. Rice demoted 25 high-ranking white officers and promoted none, while at the same time he promoted 13 black officers to those high positions and demoted none. Rice vehemently denied taking race into account in making any of his promotion or demotion decisions. He specifically disavowed any intention to engage in affirmative action by elevating blacks to positions in the admittedly disproportionately white upper ranks of the department. On those facts the Court of Appeals' panel majority found that *Harlow* precluded consideration of Rice's actual intentions in reassigning the officers, and it held Rice immune from suit on the ground that a reasonable superintendent *could have* reorganized the department as Rice did for affirmative action purposes. One member of that panel thought the majority was taking *Harlow* a bit too far (see Judge Wood's dissent, *id.* at 349 ("The majority, nevertheless, creates for Rice a paper-mache affirmative action defense just for the purpose of granting qualified immunity")), and since then the Court of Appeals has voted to vacate that opinion and scheduled a rehearing of that case en banc (*Auriemma v. Rice*, 902 F.2d 1245 (7th Cir.1990)). In the current case, however, the *Harlow* approach has none of the results that Judge Wood found objectionable in *Auriemma*. Here there is no need to invent a permissible motive for defendants' actions out of whole cloth, because defendants have consistently claimed the reassignments were for security purposes. Under *Harlow* this Court must simply ask whether reasonable officers could have believed that their actions in pursuit of those purposes would not violate any of Baptist's legal rights.

security concerns. Interestingly, Baptist himself recognizes that simply raising such an issue of fact is insufficient to establish that defendants' proffered explanation is unreasonable. Instead he argues (P.Mem. 14, emphasis added):

[F]or this Court to find the Defendants immune on these facts, the Court must find as a matter of law that the Defendants possessed a [sic] objectively reasonable belief that their actions were *solely* motivated by security. Only then can the Defendants rely in good-faith upon Section 420.40 of the IDOC Rules. If, on the contrary, this Court determines that the Defendants claim is impeached in part and they have not established as a matter of law the objective reasonableness of their claim that they were motivated solely by reason of security, then discipline is another possible reason for their actions. And if discipline was a *possible motivating factor* in their actions reassigning Plaintiff, then Plaintiff suggests that this Court cannot find that the Defendants acted in good faith when they ignored or circumvented the provisions of Section 1003–8–7.

But Baptist has the law backwards. Regardless of what invidious factors may possibly have motivated defendants, if this Court finds that reasonable officials acting under the same circumstances could have been motivated by another noninvidious and rational purpose, defendants are entitled to immunity.

That leads to the second question. On that score Baptist has failed to point to— and this Court's independent research has (not surprisingly) failed to turn up—even a single case in which a court has found that a similar reassignment for security purposes calls into play the procedural protections of Section 1003–8–7. On the contrary, in *Mathews,* 779 F.2d at 415–16 plaintiff Mathews alleged a due process violation arising out of his reassignment from the medium security "farm" at the Pontiac Correctional Center back inside the walls to the maximum security area—a reassignment made after two other inmates had escaped from the farm. As in the current case, Mathews was not charged with any rule violation or any complicity in the escape, but defendants decided to reassign him to prevent future escapes. Defendant Fairman (*id.* at 416) testified that such events "usually come in rashes" when security becomes relaxed and that Mathews' transfer had been part of a general tightening of security in the farm.

Similarly, reasonable prison officials in the current case could have determined that the relaxation of security that led to the theft of an engraver would lead to more such episodes unless all the inmates who could possibly have been involved were reassigned wholesale and then allowed back into sensitive positions only little-by-little (if at all) as they proved themselves individually trustworthy. Even though that is not the only possible explanation for defendants' conduct, the doctrine of qualified immunity mandates that defendants be free from damage actions arising from their conduct that could be thus rationally explained.[13]

### Conclusion

Baptist's right under Section 1003–8–7(e) to procedural safeguards before losing his prison employment for disciplinary reasons

---

**13.** Taking such an approach to issues arising at the summary judgment stage of litigation is always jarring to the familiar notion that all reasonable inferences be drawn in favor of the party resisting the entry of summary judgment (see n. 2). That notion has its origin in the general principle that summary judgment is not an appropriate substitute for trial on the merits, but is instead reserved for situations in which the movant can establish an entitlement to a judgment as a matter of law irrespective of any facts that may be disputed (that is, only where any disputed facts are non-outcome-determinative). But *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738 establishes an additional role for summary judgment where public officials are sued for damages arising out of actions taken in their official capacities: to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." Because governmental immunity is immunity *from suit* and not merely immunity from having damages assessed, *Harlow, id.* makes the availability of such immunity a threshold question that should be resolved even before discovery. As this case demonstrates, that means officials may be entitled to summary judgment in their favor just because they *could* have acted reasonably.

would have been violated if defendants had actually reassigned him on those grounds while attaching the pretextual label of "security" to that reassignment. In those terms a genuine issue of material fact as to defendants' actual intent would preclude the entry of summary judgment. But that is not how qualified immunity works—for that purpose what controls is that defendants have demonstrated that their actions *could have been* objectively justified on security grounds by reasonable prison officials. No clearly established law at the time that defendants acted taught that such a set of security-oriented transfers would be "disciplinary" within the meaning of the statute.

Defendants have therefore met their burden to establish qualified immunity from suit. Accordingly they are entitled to a judgment as a matter of law. This action is dismissed.[14]

---

**14.** Although Baptist has thus lost his case, special thanks are due to his appointed counsel John Sullivan, Esq. for having put the best face possible on Baptist's constitutional arguments. In short, Baptist's loss was certainly not for lack of effort on the part of the lawyer appointed to serve him.