**Willie JOIHNER, Plaintiff–Appellant,**

v.

**Stephen L. McEVERS, Captain Hockaday, and M. Spinner Jones, Defendants–Appellees.**

No. 89–1469.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 30, 1990.

Decided March 28, 1990.

Raymond P. Niro, Joseph N. Hosteny, Niro, Scavone, Haller & Niro, Chicago, Ill., for plaintiff-appellant.

Jan E. Hughes, William K. Kane, Asst. Attys. Gen., Chicago, Ill., for defendants-appellees.

Before CUMMINGS and POSNER, Circuit Judges, and PELL, Senior Circuit Judge.

PELL, Senior Circuit Judge.

Appellant Willie Joihner appeals the grant of summary judgment for defendants in his 42 U.S.C. § 1983 action against officials at Logan Correctional Center where he is incarcerated. The district court held that the officials violated no protectible liberty interest when they denied Joihner's request to be transferred to a work camp.

I.

In August 1986, Joihner requested he be assigned to the Hanna City work camp. This assignment would provide Joihner with higher pay and better living conditions than he had at Logan. In the parties' stipulation of uncontested facts, it was conceded that Joihner was qualified for transfer in every respect except his health. Thus, Joihner's request was tentatively approved by the Assignment Committee pending medical clearance. Joihner was never granted medical clearance, however, and thus was never transferred. Joihner claims that he was not notified of the denial until one month later when he spoke to Defendant Mary Jones, a nurse at Logan. She allegedly told Joihner that he was being denied permission to transfer because he was taking a controlled medication to prevent epileptic seizures and because he had a circulatory problem in his leg for which he took additional medication.

Joihner did not file a grievance over his denial, although this procedure was allegedly available to him. Instead, several months later—in March 1987—Joihner asked Jones to put the reasons for his denial in writing. Jones wrote that Joihner's request was denied due to his medical condition. Joihner filed suit on June 11, 1987. Summary judgment was entered against him on February 8, 1989 and his notice of appeal was timely filed on March 7, 1989.

II.

The district court held that Joihner failed to establish that a protectible liberty interest was implicated when the defendants denied his request for a transfer. As the Supreme Court recently reiterated, "procedural due process questions are examined in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dept. of Corrections v. Thompson,* —— U.S. ——, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989) (citations omitted).

Addressing the first step in the analysis, the interest in question must rise to more than " 'an abstract need or desire,' " *id.*

(quoting *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972)); "[r]ather, an individual must have a legitimate claim of entitlement to it." *Id.* While property interests are created solely by state law, liberty interests may originate in either the Constitution or state law. *Shango v. Jurich,* 681 F.2d 1091, 1097 (7th Cir.1982). "The due process clause, in and of itself, does not 'protect a duly convicted prisoner against transfer from one institution to another within the state prison system.'" *Id.* (quoting *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)); *Bruscino v. Carlson,* 854 F.2d 162, 167 (7th Cir.1988) ("A transfer from one prison to another does not deprive the prisoner of liberty or property within the meaning of the due process clause."), *cert. denied,* —— U.S. ——, 109 S.Ct. 3193, 105 L.Ed.2d 701 (1989); *Mathews v. Fairman,* 779 F.2d 409, 413 (7th Cir.1985). Nor does the Constitution guarantee a prisoner the right to a job. *Garza v. Miller,* 688 F.2d 480, 485 (7th Cir.1982), *cert. denied,* 459 U.S. 1150, 103 S.Ct. 796, 74 L.Ed.2d 1000 (1983). Thus, in this case, Joihner must ground a protectible liberty interest in state law.

State law creates a protectible liberty interest when it "plac[es] substantive limitations on official discretion." *Thompson,* 109 S.Ct. at 1909 (quoting *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983)). This can be done "by establishing 'substantive predicates' to govern official discretion," and "mandating the outcome to be reached upon a finding that the relevant criteria have been met." *Id.* Thus, in analyzing the question, we must look to the relevant language of the statute or regulation to determine whether it is mandatory, or merely precatory, in nature.

In Illinois, a prisoner's ability to transfer to a work camp is governed by state statute and administrative regulations promulgated by the Illinois Department of Corrections. The statute, Ill.Rev.Stat. ch. 38, para. 1003–12–1, provides that

[t]he Department shall, insofar as possible, employ at useful work committed persons confined in institutions and facilities of the Department, who are over the age of compulsory school attendance, physically capable of such employment, and not otherwise occupied in the programs of the Department.

It is clear from the language of this passage that the Department is given discretion over job assignment decisions. It is required to place inmates in jobs only insofar as possible; there is no mandatory language requiring a particular outcome. The existence of this type of discretion negates the creation of a protected liberty interest. *Thompson,* 109 S.Ct. at 1910; *Mathews,* 779 F.2d at 414; *Shango,* 681 F.2d at 1100.

Joihner argues, however, that the two administrative regulations that address the specific criteria used to place prisoners in work camps combine with the statute to create a protected liberty interest. First, the Department has promulgated administrative directive 05–06–115A, entitled "Transfers to Adult Facilities and Work/Road Camps," which provides, in part:

F. *Requirements for Processing Transfers to Work/Road Camps*

The transfer of an inmate to a work/road camp shall be approved only for the camp under the administration of the facility where the inmate is currently located. The Institutional Assignment Officer shall review inmate applications for transfer to a work/road camp.

1. If the Institutional Assignment Officer recommends that the inmate be transferred to a work/road camp, the application and the Officer's recommendation shall be reviewed and approved/disapproved by the Chief Administrative Officer.

2. If the inmate is approved for transfer, his medical file shall be reviewed prior to transfer to ensure there are no pending medical problems, the nature of which would preclude transfer.

This directive was issued on March 1, 1986 (several months before Joihner first requested placement) and defendant Stephen McEvers, Logan's Warden, issued Bulletin No. 14 on March 17, 1986 specifically to direct the placement of inmates at the Han-

na City work camp which was under his jurisdiction. Bulletin No. 14 provides, in part:

RE: NEW CRITERIA FOR HANNA CITY WORK CAMP TRANSFER Effective immediately, the new criteria allows [sic] for inmates who ...

4) Have no serious medical problems such as, but not limited to, a severe heart condition, or any disability that requires confinement to a wheelchair or results in limited mobility....

Joihner points out that these regulations contain explicit, mandatory language such as "shall be approved" and "shall be reviewed." He argues that this language, when read in conjunction with the state statute calling for jobs for those inmates "physically capable of ... employment," creates a protectible liberty interest. Joihner claims that the language

strips the defendants of the discretion to reject physically fit inmates who are otherwise satisfactory. The two examples given in the regulation, a "severe heart condition" and "confinement to a wheelchair," would clearly lead a reasonable person to believe that an inmate would be rejected on medical grounds only for a severe medical problem on the part of the inmate. The statute, carried into effect by the Directive and the Bulletin is a command that capable persons be employed, not an eligibility list.

The defendants disagree, arguing that Bulletin No. 14 involves at most criteria that guide discretion and that the criteria do not remove the underlying discretion given to the officials by the statute.

In *Kentucky Department of Corrections v. Thompson, supra,* the Court held that Kentucky's prison visitation regulations provided criteria to guide an official's discretion in determining which visitors were permitted, but that these standards did not contain the mandatory language necessary to create a protectible liberty interest. 109 S.Ct. at 1910. This was true because the guidelines "stop[ped] short of requiring that a particular result [was] to be reached upon a finding that substantive predicates [were] met." *Id.* The effect,

therefore, was to negate the existence of a protectible liberty interest. *See also Miller v. Henman,* 804 F.2d 421, 424 (7th Cir.1986) ("The existence of substantive criteria is compatible with unfettered discretion to disregard the criteria."), *cert. denied,* 484 U.S. 844, 108 S.Ct. 136, 98 L.Ed.2d 93 (1987).

In the case before us, the same reasoning applies. Although the statute and regulations provide criteria for the guidance of discretion, there is no mandatory language directing that a certain outcome be reached. The statute requires employment only "insofar as possible." The Directive implementing this "duty" requires that an officer review applications for work camp, but does not require that all inmates who are approved must be assigned. As Judge Marshall put it: "[T]he only limit established by these guidelines pertains to which inmates are *eligible* for work, they do not limit discretion in deciding which of those eligible will actually be assigned. In other words, they speak only to who may be assigned, they say nothing with regard to who must be assigned."

The language used avoids any tones of assurance. The guidelines say "if" the officer "recommends" transfer, then the chief officer will "approve/disapprove" the recommendation. The Bulletin provides criteria that "allow[ ]" placement in the work camp. Nothing in this language commands a particular outcome. To the contrary, it reaffirms the discretionary nature of work camp placement.

Joihner's focus on intermittent mandatory language throughout the statute and regulations is misplaced. As the Court stated in *Thompson,* "it should be obvious that the mandatory language requirement is not an invitation ... to search regulations for *any* imperative that might be found. The search is for *relevant* mandatory language that expressly requires the decisionmaker to apply certain substantive predicates in determining [whether] an inmate may be deprived of the particular interest in question." 109 S.Ct. 1910 n. 4 (emphasis in original).

Further, the guidelines call for a review of the applicant's medical file "to ensure

there are no pending medical problems, the nature of which would preclude the transfer." Moreover, the Bulletin by its own language does not provide an exhaustive list of medical problems ("such as, but not limited to") that would prevent work camp assignment. The prison officials remain free to deny work camp placement for any number of reasons, or for no reasons at all. Of course, officials are prohibited from punishing or retaliating against an inmate for exercising constitutional rights, *see Shango,* 681 F.2d at 1103, but that is not his case. In short, the prisoner applicant has no "right" to be placed in a work camp and thus the denial of a request for placement need not be accompanied by procedural safeguards.

### III.

The plaintiff in this case was unable to establish that a protectible liberty interest existed, and thus the district court did not proceed to the next question in the analysis. We agree with the district court. Joihner has not established that the district court erred in granting summary judgment for the defendants. We therefore affirm the district court judgment.