**Phillip WALLACE, Plaintiff–Appellant,**

v.

**Merle D. ROBINSON, Zenon Symanski, Michael O'Leary, and Michael P. Lane, Defendants–Appellees.**

No. 88–1806.

United States Court of Appeals, Seventh Circuit.

Argued May 14, 1990.

Decided Sept. 26, 1990.

Jerold S. Solovy, William A. VonHoene, Jr., Thomas S. O'Neill, Jenner & Block, Chicago, Ill., for plaintiff-appellant.

Phillip Wallace, Joliet, Ill., pro se.

Diane Curry Grapsas, Daniel N. Malato, Asst. Attys. Gen., Office of the Atty. Gen., Chicago, Ill., for defendants-appellees.

Before CUDAHY and EASTERBROOK, Circuit Judges, and SNEED, Senior Circuit Judge.[*]

SNEED, Senior Circuit Judge.

Illinois state prisoner Phillip Wallace appeals the district court's grant of summary judgment in favor of prison officials in his 42 U.S.C. § 1983 action alleging that his prison work transfer violated his due process rights. We affirm.

I.

### FACTS AND PROCEEDINGS BELOW

Phillip Wallace is an inmate of Stateville Correctional Center ("Stateville") in Joliet, Illinois. He had worked for about twenty months at the prison tailor shop, earning $100/month, until he was terminated from that position on April 29, 1986. Wallace filed suit under 42 U.S.C. § 1983 (1982) in federal district court against his tailor-shop supervisor, Merle Dean Robinson ("Robinson") and three other prison and corrections' department officials. The district court granted summary judgment to defendants.

On appeal, Wallace alleges that: (1) his termination was a disciplinary action, (2) prison officials failed to follow Illinois state

---

* Hon. Joseph T. Sneed, of the Ninth Circuit, sitting by designation.

regulations mandating certain procedures in disciplinary actions, and thereby (3) violated his due process rights. Specifically, Wallace alleges that he was terminated from his employment because his supervisor, Robinson, found homemade liquor ("hooch") in a cabinet near Wallace's work station. A termination following such an incident is disciplinary in nature, he insists, and triggered the protections articulated in Ill.Ann.Stat. ch. 38, ¶¶ 1003–8–7(b)(2), 1003–8–7(e)(6) (1982)[1] and Ill.Admin.Code tit. 20, § 504 (1985).[2]

The defendants take issue with Wallace's characterization of the termination.[3] They view the termination as a change in Wallace's work assignment made necessary by a series of events that had led to increasingly poor relations between Wallace and his supervisor, Robinson. They allege that they sought to prevent further exacerbation of existing tensions. It follows, defendants argue, that the state statute and regulations cited by Wallace[4] are not applicable. They claim that the applicable statutes and regulations, which pertain to prison work assignments, do not create a liberty or property interest in prison employment and provide prison officials with considerable discretion.[5]

The defendants set forth the following events. Wallace was suspected of assaulting another inmate on March 7, 1986. During a two-week investigation, he was not permitted to work. On his first day back from work, he did not return to his post after lunch. In the past, many employees had failed to return after lunch. During Wallace's two-week absence, Robinson wrote a memorandum to the inmates instructing them to return to their stations after lunch. The memorandum was posted on the bulletin board. Reportedly, Robinson and Wallace engaged in a "heated discussion" over the application to Wallace of the policy set forth in the memorandum.[6] Robinson recommended to the proper authorities that Wallace be terminated from the tailor shop assignment.

No action was taken by prison officials at that time. Several weeks later, Robinson found the hooch in a cabinet near Wallace's work station. Although Robinson prepared an "incident" report concerning Wallace's suspected involvement with the hooch, he did not prepare a "disciplinary" report.

On April 23, 1986, Wallace had a hearing before the Assignment Committee, after which he was instructed to continue working in the tailor shop. Six days later, April 29, 1986, Wallace was terminated from his position. The Committee subsequently stated in a memorandum:

> The Committee voted to remove Wallace from the tailor shop. It was felt that such action was justified in order to preclude more serious problems between Wallace and Supervisor Robinson. However, this should not be construed as a disciplinary action and the inmate was advised that he has a right to file a grievance as he chooses.

As Wallace sees it, his termination was the direct result of the "hooch" incident which was never proven against him. The defendants, on the other hand, characterize Wal-

---

**1.** Ill.Ann.Stat. ch. 38, ¶ 1003–8–7(b)(2) (1982) reads in pertinent part: "Disciplinary restrictions on visitations, work, education or program assignments ... shall be related as closely as practicable to abuse of such privileges or facilities."

**2.** Ill.Admin.Code tit. 20, § 504 (1985) sets forth the procedures for inmate discipline. Among the required procedures are the preparation of disciplinary reports, review of such reports, and a hearing before a determination of guilt and imposition of penalty. See Ill.Admin.Code tit. 20, §§ 504.20(a), 504.30(b)-(c), 504.60(a) (1985).

**3.** In their brief, defendants concede that if the termination was disciplinary in nature, they "ar-

guably should have afforded Wallace additional procedures."

**4.** See supra notes 1–2.

**5.** Specifically, the defendants cite Ill.Ann.Stat. ch. 38, ¶ 1001–1–1 et seq. (Supp.1990) and Ill.Admin.Code tit. 20, § 420.30 (1985).

**6.** Apparently, Robinson accused Wallace of violating a policy of which he had notice. In response, Wallace argued that Robinson was obligated to point out the memo to him because Wallace had been absent when the notice was first promulgated.

lace's termination as a disciplinary transfer caused by a deteriorating relationship between an employee and his supervisor.

On May 20, 1987, Wallace (after exhausting prison grievance procedures) filed a *pro se* complaint in federal court. Defendants moved for summary judgment on November 25, 1987. Unfortunately, neither party focused on the disciplinary versus nondisciplinary distinction below. In fact, the defendants in their motion for summary judgment stated: "Plaintiff was removed from his assignment in the tailor shop on April 16, 1986 because his supervisor found homemade alcohol (hooch) in a cabinet by his desk."

Wallace, quite naturally, alleges that defendants' summary judgment motion directly contradicts the position now taken on appeal. He also points out that the district court concluded that the reason for the termination was the "hooch" incident. Nonetheless, the district court, in granting defendants' motion for summary judgment, ruled that "plaintiff has no property/liberty interest in his assignment" and that "his reassignment was not done arbitrarily or capriciously." *Id.* That is, the case was treated as a standard work reassignment. Our jurisdiction derives from 28 U.S.C. § 1291 (1988).

## II.

### STANDARD OF REVIEW

■ We review grants of summary judgment de novo. We review the record to determine whether there is "a genuine issue with regard to any material fact and whether the defendants were entitled to judgment as a matter of law." *Cain v. Lane,* 857 F.2d 1139, 1142 (7th Cir.1988). Furthermore, because Wallace "proceeded *pro se* in the district court, that court was obliged to read the complaint liberally." *Id.*

## III.

### DISCUSSION

■ Due process rights protected by the Fourteenth Amendment, life, liberty, and property, arise from two sources: the Due Process Clause itself, and state law. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 1908–09, 104 L.Ed.2d 506 (1989); *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983); *Harris v. McDonald,* 737 F.2d 662, 664 (7th Cir.1984); *Shango v. Jurich,* 681 F.2d 1091, 1098–99 (7th Cir. 1982).

### A. Does the Due Process Clause Alone Create a Protectible Liberty Interest in the Work Assignments of Inmates?

■ The Supreme Court has explicitly "rejected the notion 'that *any* change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the protections of the Due Process Clause.'" *Thompson,* 109 S.Ct. at 1908 (quoting *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976)).

> As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison authorities to judicial oversight. The Clause does not require hearings in connection with transfers whether or not they are the result of the inmate's misbehavior or may be labeled as disciplinary or punitive.

*Montanye v. Haymes,* 427 U.S. 236, 242, 96 S.Ct. 2543, 2547, 49 L.Ed.2d 466 (1976).

The Court has held that "prison officials have broad administrative and disciplinary authority over the institutions they manage and that lawfully incarcerated persons retain only a narrow range of protected liberty interests." *Hewitt,* 459 U.S. at 467, 103 S.Ct. at 869. Thus, the Court has determined that the Due Process Clause does not create a right to parole, *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979), to good-time credit, *Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S.Ct. 2963, 2975, 41 L.Ed.2d 935 (1974), to avoid transfer from one correctional facility to another, *Mea-*

*chum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976), to remain in the general prison population and avoid administrative segregation, *Hewitt,* 459 U.S. at 468, 103 S.Ct. at 869, or to visitation, *Thompson,* 109 S.Ct. at 1909. In light of these precedents, it is clear that the Due Process Clause does not create a protectible liberty interest in a particular work assignment of an inmate. *Cf. Harris,* 737 F.2d at 664 (there is no constitutionally based liberty interest requiring that inmates be provided due process prior to transfer from one correctional facility to another); *Shango,* 681 F.2d at 1098 (same).

B. *Does Illinois State Law Create a Liberty Interest in a Prison Work Assignment, the Deprivation of Which Must Be Accompanied by Due Process of Law?* [7]

"[S]tate law may create enforceable liberty interests in a prison setting." *Thompson,* 109 S.Ct. at 1909. To create a protectible liberty interest, state statutes or regulations "must use 'language of an unmistakably mandatory character, requiring that certain procedures "shall," "will," or "must" be employed ...,' and that certain action will not be taken by prison officials 'absent specified substantive predicates.' " *Merritt v. Broglin,* 891 F.2d 169, 172 (7th Cir.1989) (quoting *Hewitt,* 459 U.S. at 471–72, 103 S.Ct. at 871).

To determine whether Wallace's transfer invoked a protectible liberty interest, we must first determine which statutes and regulations apply. If Wallace's job transfer was disciplinary in nature, we apply Ill.Ann.Stat. ch. 38, ¶ 1003–8–7(b)(2) (1982) and Ill.Admin.Code tit. 20, § 504 (1985). If it is not, we apply Ill.Ann.Stat. ch. 38, ¶¶ 1003–12–1 and 1003–12–2 (Supp.1990) and Ill.Admin.Code tit. 20, § 420.30 (1985). This choice of law is at the center of the dispute between the parties. Our first task, therefore, is to consider whether Wallace has "affirmatively show[n] that there is a genuine issue for trial," *Merritt,* 891

F.2d at 171, concerning whether his job transfer was disciplinary. If he has, we should reverse to permit an examination of the procedures employed by the prison officials to determine whether they meet the demands of the Due Process Clause. If not, we should affirm.

1. Was the Transfer Disciplinary?

■ We have previously held that "[i]n determining whether a prison official's action is disciplinary in nature, [we] distinguish[ ] between 'what is essentially a predictive decision based on assessment of a prisoner's entire institutional record and a decision in response to a specific rule infraction.'" *Mathews v. Fairman,* 779 F.2d 409, 415 (7th Cir.1985) (quoting *Shango v. Jurich,* 681 F.2d 1091, 1103 n. 20 (7th Cir.1982)). Thus, in this case, we must determine whether the Assignment Committee's transfer of Wallace from his tailor shop job was predictive in nature, that is, an attempt to prevent future problems, or whether it was intended as a punishment for a specific rule infraction.

Appellant correctly points out that the district court and appellees before the district court referred to the transfer as disciplinary. In our view they were incorrect in doing so. Neither the parties nor the district court focused attention on the subtle, but critical, distinction between predictive and disciplinary transfers. However, our review does not depend on the terminology used by the district court or the appellees before the district court. Rather, we examine the *actual purposes* underlying the prison administration's decision to transfer Wallace from his tailor shop job. *See Abdul–Wadood v. Duckworth,* 860 F.2d 280, 285 (7th Cir.1988); *Mathews v. Fairman,* 779 F.2d 409, 415 (7th Cir.1985) (distinguishing between actions by prison officials taken for administrative versus disciplinary reasons); *Shango v. Jurich,* 681 F.2d 1091, 1103 n. 20 (7th Cir.1982) (same).

In *Abdul–Wadood,* we held that "the issue becomes whether the restrictions

---

**7.** Appellant does not assert, and we therefore do not consider, whether a property interest protec-

tible by the Due Process Clause is implicated.

placed on [the inmate] were for the *purpose* of punishing him" or to prevent future problems within the prison. 860 F.2d at 285. (emphasis added).[8] We noted that whether the loss of privileges resulting from the transfer were "qualitatively equivalent to that experienced by prisoners [transferred] for disciplinary reasons" is not dispositive in the determination of whether a transfer was or was not disciplinary in nature. *Id.* Administrative changes in inmate status within prison are often accompanied, necessarily, by a loss in privileges that may be similar to losses experienced by inmates who are being disciplined. *See Hewitt v. Helms,* 459 U.S. 460, 467–68, 103 S.Ct. 864, 869, 74 L.Ed.2d 675 (1983). Yet, the similarity in loss of privileges does not, alone, transform a predictive, administrative transfer into a disciplinary one.

The most direct evidence we have of the prison administration's purpose in this case consists of the documents produced by the various prison committees and boards that have reviewed Wallace's transfer. In a memorandum of the Stateville Assignment Committee, dated May 1, 1986, the Committee stated that it

> voted to remove Wallace from the tailor shop. It was felt that such action was justified in order to preclude more serious problems between Wallace and Supervisor Robinson. However, this should not be construed as a disciplinary action. . . .

The Assignment Committee could not have been clearer. It viewed the relationship difficulties between Wallace and Robinson as serious, and it sought to prevent more serious problems from erupting. There are no contradictions in its report.

Appellant claims that these reasons were pretextual, and that the administration's true purpose was disciplinary. This assertion is refuted by the conclusions of the Institutional Inquiry Board that reviewed

Wallace's grievance on May 29, 1986. The Board stated that it was "of the opinion inmate should be reviewed again by the Assignment Committee for possible placement on a job assignment that is comparable to the one he lost." The Board of Corrections Administrative Review Board agreed on August 28, 1986, and recommended that:

> the Stateville administration provide a report of the follow-up action taken, to review inmate Wallace for a comparable assignment. This was indicated in the Institutional Inquiry Board report dated May 29, 1986.

To recommend comparable placement is not consistent with a punitive job transfer. Were it the latter, a demotion would be recommended. The most plausible explanation for the repeated recommendation that Wallace be given a comparable assignment is that his transfer was *not* disciplinary. Furthermore, the fact that prison administration did not issue a disciplinary report on the incident or on other "incidents" identified by Robinson as requiring discipline supports the administration's claim that it viewed the problems as the result of a poor relationship between Wallace and Robinson rather than as blameworthy behavior on Wallace's part. Finally, a review of the relational history between Wallace and Robinson reveals that the prison administration's concern was not unreasonable—the relationship between the two was characterized by exacerbating tensions over an extended period of time. It was reasonable for prison authorities to act to prevent more serious problems from erupting. Prison officials may change an inmate's work assignment, *see Watts v. Morgan,* 572 F.Supp. 1385, 1389–90 (N.D. Ill.1983) (transfer of work assignment to prevent inmate from developing familiarity with staff members), or other aspect of inmate status, *see Mathews,* 779 F.2d at 415–16 (transfer to maximum security unit

---

**8.** In *Abdul–Wadood,* we implicitly rejected the test offered by Wallace and set forth previously by this court in *Buise v. Hudkins,* 584 F.2d 223, 229 n. 8 (7th Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979). In *Buise,* we had stated that "whether a transfer is sufficiently punitive would not be whether the prison officials deemed it punitive. Rather it would be an inquiry into, among other things, the relative conditions in the institutions and the harms of dislocation itself, and how the inmate perceived them." *Id.*

to prevent escape), as a preventive measure.

Wallace has failed to produce sufficient evidence to show affirmatively that there is a triable issue of fact as to whether his transfer was or was not disciplinary in nature. *Cf. id.* at 416 (affirming grant of directed verdict in case with analogous fact pattern, concluding that appellant had not "produced sufficient evidence upon which a jury could properly find that [appellant's] reassignment ... was a disciplinary action").

2. Did the Non–Disciplinary Job Transfer Deprive Wallace of Liberty Without Due Process of Law?

 Since Wallace's transfer was not disciplinary in nature, the transfer does not invoke those Illinois statutory and regulatory protections, Ill.Ann.Stat. ch. 38, ¶ 1003–8–7(b)(2), Ill.Admin.Code tit. 20, § 504 (1985), that are triggered by disciplinary actions. Instead, we apply those code and regulatory provisions, Ill.Ann.Stat. ch. 38, ¶¶ 1003–12–1 and 1003–12–2, Ill.Admin. Code tit. 20, § 420.30 (1985), that govern prison employment more generally.

In reviewing these provisions to determine whether they " 'create[ ] a protected liberty interest,' " we focus upon whether the provisions place " 'substantive limitations on official discretion.' " *Thompson,* 109 S.Ct. at 1909 (quoting *Olim v. Wakinekona,* 461 U.S. 238, 249, 103 S.Ct. 1741, 1747, 75 L.Ed.2d 813 (1983)); *see also Merritt v. Broglin,* 891 F.2d 169, 172 (7th Cir.1989). State law can create a protectible liberty interest if it establishes " 'substantive predicates' to govern official decisionmaking" and mandates "the outcome to be reached upon a finding that the relevant criteria have been met." *Thompson,* 109 S.Ct. at 1909 (quoting *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871). "The existence of some standards or criteria to follow is not determinative; this court has noted a 'difference between criteria and binding rules of decision,' only the latter being sufficient to create a liberty interest." *Merritt,* 891 F.2d at 172 (quoting *Miller v. Henman,*

804 F.2d 421, 424 (7th Cir.1986), *cert. denied,* 484 U.S. 844, 108 S.Ct. 136, 98 L.Ed.2d 93 (1987)).

The law set forth in paragraph 1003–12–1 reads, in pertinent part:

> The Department shall, *in so far as possible,* employ at useful work committed persons confined in institutions.... Such employment shall equip such persons with marketable skills, promote habits of work and responsibility and contribute to the expense of the employment program and the committed person's cost of incarceration.

Ill.Ann.Stat. ch. 38, ¶ 1003–12–1 (Supp. 1990) (emphasis added). In *Joihner v. McEvers,* 898 F.2d 569, 571 (7th Cir.1990), we recently held that paragraph 1003–12–1 does not create a protected liberty interest. "It is clear from the language ... that the Department is given discretion over job assignment decisions.... [T]here is no mandatory language requiring a particular outcome." *Id.; see also Watts v. Morgan,* 572 F.Supp. 1385, 1389 (N.D.Ill.1983). Rather, the use of the phrase "in so far as possible," explicitly reserves discretion to prison authorities to balance employment considerations with other institutional needs. The language of paragraph 1003–12–2(a) also grants the Department of Corrections discretion in managing prison work programs such as the tailor shop where Wallace was employed. It reads, in pertinent part:

> The Department *may* establish, maintain, train and employ committed persons in industries for the production of articles, materials or supplies for resale to authorized purchasers.

Ill.Ann.Stat. ch. 38, ¶ 1003–12–2(a) (emphasis added); *see Watts,* 572 F.Supp. at 1389.

Nor do the applicable regulations create a protectible liberty interest. Section 420.-30 sets forth, among other things, the Assignment Committee's role in making job assignment recommendations and the inmate's right to address the Assignment Committee.[9] Its wording reveals that an

---

9. This section reads, in pertinent part:

 (a) The Assignment Committee shall, within

60 days following admission for adults, ...

inmate's initial job assignment is discretionary: "Section 420.30 cannot conceivably be stretched to create a liberty or property interest" in that job assignment after it is implemented. *Jackson v. O'Leary*, 689 F.Supp. 846, 849 (N.D.Ill.1988). We conclude also that, section 420.40 of the regulations, which pertains most directly to a work assignment transfer such as the one at issue here, "leaves the decision to remove an inmate from a work assignment to the unfettered discretion of prison officials." *Jackson*, 689 F.Supp. at 849. That section provides that:

> A committed person *may* be removed from his assignment and/or reassigned by the Chief Administrative Officer or his designee. However, in the Adult Division, the Assignment Committee Chairman *may* upon approval of an Assistant Warden, remove or reassign a committed person. The Assignment Committee shall review such action taken by the Assignment Committee Chairman if requested to do so in writing by the committed person.

Ill.Admin.Code tit. 20, § 420.40 (emphasis added).

We hold that neither the cited statutes or regulations creates a protectible liberty interest in a prison work assignment. Therefore, we affirm the district court's judgment.

AFFIRMED.

CUDAHY, Circuit Judge, concurring in part and dissenting in part:

I fully concur with Judge Sneed's scholarly treatment of the question whether the Illinois statutes and regulations created a liberty or property interest in a prisoner's not being fired from his job for disciplinary reasons. I am not persuaded, however, that there is no disputed question of material fact whether Wallace's firing was for disciplinary, as opposed to administrative, reasons. In fact, the district judge observed that Wallace was fired because of the hooch incident. It may be that Wallace received all the process he was due, since he was allowed to appear before the Assignment Committee. *Cf. Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). I would attempt to decide the case on that basis or remand to the district court for a determination of the issue whether the discharge was disciplinary. I respectfully dissent to the extent indicated.

EASTERBROOK, Circuit Judge, concurring in the judgment.

Illinois has a rule of the form: "The warden may do $A$ for any reason, but if that reason is $M$ the warden must prove $M$ before acting." Alternatively a state might say: "The warden may do $A$ for any reason except $M$." Does either create a "liberty" interest, so that the due process clauses require hearings before the state acts? Judge Sneed answers "it depends on whether the warden is acting for reason $M$" and supports affirmance because, he concludes, the warden's reason was not $M$. Judge Cudahy apparently agrees with this approach but not with its application. I conclude that neither of these rules creates a liberty interest and therefore believe that the warden's reason is irrelevant. This brings me out with Judge Sneed, although for a different reason.

$A$ in our case is changing the prisoner's job assignment. $M$ is misconduct. Wallace may have taken hooch to his job at the tailor shop, which violates a rule of the prison. Or he may have gotten his supervisor's goat, which violates no rule but may make it wise to move. Or he may have done both. Few workers in the United States hold their jobs until the employer

make a recommendation for the assignment of a committed person received at an assigned facility.

. . . .

(d) A committed person may be given an opportunity to appear before and address the Assignment Committee whenever his case is being considered.

(e) Recommendations made by the Assignment Committee Chairman or the Committee shall be in writing.

(f) All recommendations are subject to review and approval by the Chief Administrative Officer or his designee.

Ill.Admin.Code tit. 20, § 420.30 (1985).

shows "just cause" to dismiss them. Prisoners assuredly are not among those with tenure. The thirteenth amendment abolishes involuntary servitude "except as a punishment for crime whereof the party shall have been duly convicted".

Illinois could give a prisoner an enforceable interest in a particular job but has not. Ill.Rev.Stat. ch. 38 ¶ 1003–12–1 provides that the Department of Corrections "shall, in so far as possible, employ at useful work committed persons confined in institutions". This takes a step toward ensuring a job for each prisoner, but not a particular job. One step, moreover, is not the same as a liberty interest. Only statutes or rules with "explicitly mandatory language", *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 109 S.Ct. 1904, 1909–10, 104 L.Ed.2d 506 (1989), give prisoners liberty or property interests. Weasel words such as "in so far as possible" show that Illinois has not assured its inmates any job, let alone the job the inmate prefers. The warden therefore could switch Wallace from tailor to clerk on learning that he burned the trousers, or did not return after lunch, or sassed his supervisor—or for no particular reason at all. Paragraph 1003–12–1 does not create a liberty or property interest.

Illinois does curtail the discretion of wardens to punish prisoners by changing their jobs. Ill.Rev.Stat. ch. 38 ¶ 1003–8–7(b)(2) provides that "[d]isciplinary restrictions on visitations, work, education or program assignments . . . shall be related as closely as practicable to abuse of such privileges or facilities." Subparagraph 7(e) continues:

> (e) In disciplinary cases which may involve . . . a change in work, education, or other program assignment of more than 7 days duration, the Director shall establish disciplinary procedures consistent with the following principles: . . .
>
> (6) A change in work, education, or other program assignment shall not be used for disciplinary purposes except as provided in paragraph (b) of this Section and then only after review and approval under Section 3–8–3.

Section 3–8–3 establishes elaborate procedures to use in disciplinary cases, and administrative regulations add still more procedures. The upshot is that the prison may change job assignments only for "abuse of such privileges or facilities" (at least when that is "practicable"), and then only after following prescribed steps. Thus the characterization of the Illinois rules with which I began: "The warden may do $A$ [give the prisoner a different job] for any reason, but if that reason is $M$ [misconduct] the warden must prove $M$ before acting." Alternatively we may understand the rule as: "The warden may do $A$ [give the prisoner a different job] for any reason except $M$ [misconduct unrelated to that job]."

Prisoners have no constitutional entitlement to one job rather than another. Treating the sort of regulations that appear in all prison systems to curtail the discretion of the guards as creating liberty or property interests nonetheless gives the prisoners greater protections of their employment than free persons receive. Because everything prisons do is state action, and prisons control every aspect of the inmates' lives, decisions that to some degree depend on the regulatory apparatus occur every day for every inmate. *Thompson* reserves, 109 S.Ct. at 1909 n. 3, the question whether regulations of whatever kind create liberty out of the minor decisions that characterize prison life. We ought to answer that question "No". See *Moody v. Daggett*, 429 U.S. 78, 88 n. 9, 97 S.Ct. 274, 279 n. 9, 50 L.Ed.2d 236 (1976). When the state takes away good time credits or denies release on parole, the decision affects the duration of confinement. When a state turns one inmate from a tailor into a clerk, another inmate gets to be a tailor. Both experience the ordinary incidents of confinement in any penal system.

Prisons put their charges to work for the benefit of society (work supplies a combination of rehabilitation and punishment). Statutes and regulations governing job assignments, commissary privileges, and the like are efforts by the state to control the jailers, to reduce disparity among its agents, not to give the prisoners legally enforceable entitlements. So we under-

stood them in *Miller v. Henman*, 804 F.2d 421 (7th Cir.1986); *Colon v. Schneider*, 899 F.2d 660, 667–69 (7th Cir.1990); *Woods v. Thieret*, 903 F.2d 1080, 1082–83 (7th Cir. 1990); and other recent cases. Anything else ties prisons up in bureaucratic knots, turning guards' attention from the prisoners to the procedures. In such a place, with damages liability awaiting guards who take a wrong step, live and let live is the best policy. Turn a blind eye. Protect your wallet first, worry about the safety of the prisoners second and the rules of the prison third (or not at all). No wonder prisons are so hard to control. See *David K. v. Lane*, 839 F.2d 1265, 1278–80 (7th Cir.1988) (concurring opinion). Are American courts out to use prisons as models for Grant Gilmore's bitter valedictory that "[i]n Hell there will be nothing but law, and due process will be meticulously observed."? *The Ages of American Law* 111 (1977).

Behind the accretion of procedures in state prisons stands nothing but state law. No constitutional clause or policy, no federal rule or policy, requires states to accord prisoners the protections civil servants receive. If Illinois wants to do more than the Constitution requires yet falls short of objectives it has set for itself, the error should be understood as a violation of state law, to be redressed through state agencies and courts. The due process clause of the fourteenth amendment is not a federal guarantee that states will follow their own laws. *Easter House v. Felder*, 910 F.2d 1387 (7th Cir.1990) (in banc); *Archie v. Racine*, 847 F.2d 1211, 1215–18 (7th Cir. 1988) (in banc); *Doe v. Milwaukee County*, 903 F.2d 499 (7th Cir.1990); *Thornton v. Barnes*, 890 F.2d 1380, 1391 (7th Cir.1989) (concurring opinion); *Caine v. Hardy*, 905 F.2d 858, 863–67 (5th Cir.1990) (Jones, J., dissenting), rehearing in banc granted, 1990 U.S.App. Lexis 13558. So if guards tried to tiptoe around ¶ 1003–8–7(b)(2) and penalize Wallace for his hooch by turning him into a clerk, that is a subject for the courts of Illinois, not for constitutional litigation.

Let us suppose, however, that a change of job ought to be treated the same as a decision not to release Wallace from prison. Then the question becomes whether the state's rules create a "legitimate claim of entitlement". *Thompson*, 109 S.Ct. at 1908–10; *Board of Pardons v. Allen*, 482 U.S. 369, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987); *Olim v. Wakinekona*, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 101 S.Ct. 2460, 69 L.Ed.2d 158 (1981); *Greenholtz v. Nebraska Inmates*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montanye v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). A "legitimate claim of entitlement" means more than an abstract desire. It is instead an entitlement contingent on facts, something you hold unless prescribed conditions of its defeasance can be established. *Thompson*, 109 S.Ct. at 1909–10; *Roth*, 408 U.S. at 577–79, 92 S.Ct. at 2709; *Fleury v. Clayton*, 847 F.2d 1229, 1231–32 (7th Cir.1988). Something "securely and durably yours ... as distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain". *Reed v. Village of Shorewood*, 704 F.2d 943, 948 (7th Cir.1983). How securely? Your entitlement must be "legally enforceable", *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 788 n. 21, 100 S.Ct. 2467, 2477 n. 21, 65 L.Ed.2d 506 (1980); *Upadhya v. Langenberg*, 834 F.2d 661, 665 (7th Cir.1987). Or in the formulation of *Thompson* there must be " 'explicitly mandatory language,' in connection with the establishment of 'specific substantive predicates' to limit discretion", 109 S.Ct. at 1910.

Illinois does not set up "specific substantive predicates" to limit discretion. Wallace could be moved from one job to another for almost any reason. There is no "explicitly mandatory language". Any prisoner's interest in the job-of-preference

is "meager, transitory, [and] uncertain". Prison tailors lack a "legally enforceable" interest in that job, as opposed to some other. It follows that Wallace had no liberty or property interest in being a tailor.

Now Wallace responds that although the warden may assign him a new job because the warden does not like the cut of his jib: I have a legitimate claim of entitlement not to lose my position as a tailor because of misconduct unless through proper procedures the prison shows that the misconduct took place and is job-related. This uses the language of *Roth* but is a different character from a statement such as: "I have a legitimate claim of entitlement *to the job* unless good reasons have been established." Wallace lacks this latter kind of claim. Yet only the latter claim is liberty or property for constitutional purposes, given *Thompson* and *Roth*.

Due process comes into play when substantive rules limit the reasons that support action. Procedures ensure that the necessary basis exists. When there are no necessary conditions of action, there is nothing to hold a hearing about. Illinois has the rule: "The warden may do *A* for any reason, but if that reason is *M* the warden must prove *M* before acting." Suppose Illinois gives Wallace a hearing, and the panel unanimously determines that *M* does not exist. Is Wallace secure against a change of jobs? Not at all. The warden still may say: "Fine, but prisoners who do not get along with their supervisors should move." That is that; no substantive rule, no "explicitly mandatory language", prevents the warden from making the switch. Nothing Wallace could say, no fact he could prove, would establish his entitlement to stay in the tailor shop. So there is no liberty or property interest.

Precedent dispels all doubt. Rules of the form "The state may do *A* for any reason except *M*" and "The state may do *A* for any reason, but if that reason is *M* the state must prove *M* before acting" are ubiquitous. There is no such thing as unbridled discretion in American law. No state may penalize protected expression or discriminate because of race. So a rule

that at first glance allows a warden to act for any or no reason really means: "The warden may do *A* [give the prisoner a new job] for any reason except *M* [race, speech, and so on]." See *Dumschat*, 452 U.S. at 467, 101 S.Ct. at 2465–66 (Brennan, J., concurring). Do these limits on official discretion create liberty or property interests? *Montanye* holds that they do not.

New York transferred Haymes from its prison at Attica to the one at Clinton. Haymes contended that the warden was retaliating for Haymes' efforts to give legal assistance to other prisoners. He argued—and New York conceded—that the rule in force effectively meant that "the warden may transfer a prisoner for any reason except activities protected by the first amendment." The Court held that this rule did not create a legitimate claim of entitlement, because no facts Haymes could establish at a hearing would entitle him to remain in Attica. 427 U.S. at 243, 96 S.Ct. at 2547. Even if he could establish beyond doubt that the warden's original decision was based on speech, the state could transfer him anyway, for a different (or no) reason. There was accordingly no need for a pre-transfer hearing. A transfer motivated by speech could violate the Constitution, but the bar would come from the first amendment and not the due process clause. Indeed, on remand the Second Circuit held that the state may have retaliated for protected speech. *Haymes v. Montanye*, 547 F.2d 188 (2d Cir.1976). Remedy came from the first amendment.

If New York had regulations saying: "Wardens may transfer prisoners for any reason except speech", the result would have been no different. The prisoner's *entitlement* is the same whether the rule comes from state law and the exceptions from federal law, or both have the same source. Cf. *Howlett v. Rose*, —— U.S. ——, 110 S.Ct. 2430, 2439, 110 L.Ed.2d 332 (1990) (" 'federal' law is part of the Law of the Land in the State"); *Alleghany Corp. v. Haase*, 896 F.2d 1046, 1053–56 (7th Cir. 1990) (concurring opinion). In either case, the prisoner has no right to remain in a prison unless specified facts exist. Putting one (or more) grounds off limits therefore

does not create liberty or property. As I understand Judge Sneed's approach, however, the Supreme Court and the Second Circuit should have held that the transfer violated the due process clause: the rule "No transfers in retaliation for speech" created a liberty interest, and once Haymes showed that speech was the warden's true motive, it should have followed that the state needed to give him a hearing before the transfer. *Montanye* blazes a different path.

Promises of particular procedures also do not create legitimate claims of entitlement. Consider the form: "The state may do *A* for any reason, but if the reason is *M* the state must hold hearings before acting." One could describe this as a legitimate claim of entitlement to retain one's current status until the completion of hearings. But *Olim* held that a state's extension of procedural safeguards does not create a property interest. Hawaii promised prisoners that it would not transfer them in advance of hearings. Wakinekona was transferred without hearings, and the court of appeals thought this deprived him of his legitimate claim of entitlement to process. In reversing that decision, the Court remarked that "[p]rocess is not an end in itself. Its constitutional purpose is to protect a *substantive* interest to which the individual has a legitimate claim of entitlement." 461 U.S. at 250, 103 S.Ct. at 1748 (emphasis added). See also *Doe,* 903 F.2d at 504. A prisoner whose job assignment may be changed for any reason lacks such a substantive interest, even if the state has promised elaborate procedures before using a particular reason (misconduct) as the basis of action.

Practical reasons support these precedents. I have stressed one—that using criteria of state law to define liberty that in turn activates the due process clause converts state entitlements into constitutional ones. Judge Sneed believes that in order to resolve the due process claim, we must first learn the warden's "true" reason for giving Wallace a new job. If we conclude that the reason is Wallace's misconduct, we shall declare that the transfer violated the Constitution. This is the equivalent of re-

trying, on the merits, the very question that the adjustment committee of the prison decided. Although the Constitution is not supposed to transfer to federal court all questions concerning prison governance, that would be the practical effect of my colleagues' approaches.

A second reason is that rules concerning process must be established in advance. The warden must know *before* acting whether the Constitution requires a hearing. An opinion from a federal court saying "You need to offer a hearing if you act for reason *M,* but not if you act for reason *Q* or *Z,* and we will collect damages if you do not offer a hearing and we think your real reason was *M*", leads to one of two outcomes. Either prisons will extend hearings in every case or a federal court will retry the prison's decision in order to determine the "true" reason—and thus whether a hearing was necessary. Rules, especially procedural rules, must be knowable in advance. *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 546–48, 98 S.Ct. 1197, 1213, 55 L.Ed.2d 460 (1978). Trials to determine the procedures that should have been used are wasteful, and the threat of choosing procedures after the fact throws a monkey wrench into the administrative process.

If we were on record that jailers' motive has constitutional significance, then I would have no choice but to go along with Judge Sneed. The circuit is not so committed, however. Judge Sneed cites only two cases for the proposition that motive matters. The first is at page 873: "Our first task, therefore, is to consider whether Wallace has 'affirmatively show[n] that there is a genuine issue for trial,' *Merritt* [*v. Broglin* ], 891 F.2d [169] at 171 [ (7th Cir. 1989) ], concerning whether his job transfer was disciplinary." *Merritt* does not concern the motive for a transfer. The quoted language correctly states the standard for summary judgment. The case holds that the Indiana rules concerning leave for inmates do not create a liberty or property interest. To the extent *Merritt* is pertinent, it supports the view I have been

advancing: *Merritt* holds that the state's rules do not create a liberty or property interest, 891 F.2d at 172, even though the prisoner asserted that the prison officials had acted for a reason the rules did not allow. In other words, *Merritt* implies that the motive or intent of the state officials is *not* pertinent to defining the prisoner's liberty and property interests.

The second case, cited at page 873, is *Abdul–Wadood v. Duckworth*, 860 F.2d 280 (7th Cir.1988), and Judge Sneed quotes this passage, *id.* at 285: "the issue becomes whether the restrictions placed on [the inmate] were for the purpose of punishing him". Although *Abdul–Wadood* inquires into purpose, it does so only because the parties conceded that this is appropriate, see *id.* at 284–85: "The parties do not dispute that, if Abdul–Wadood had been in fact subjected to disciplinary action, he would have had at stake a liberty interest sufficient to invoke the protection of the due process clause." Because the court decided the case on the basis of this view of the parties, it cannot be taken as a holding that purpose is dispositive. *United States v. Daniels*, 902 F.2d 1238, 1241 (7th Cir. 1990) (collecting cases). Especially not when the Indiana regulation (quoted at 285 n. 7) was *exclusively* procedural. All Indiana said was that before taking disciplinary action, the warden shall afford the person charged with misconduct a hearing. Given subsequent cases such as *Doe* and *Colon* (and earlier cases such as *Olim* that the court did not need to discuss, in light of the parties' agreement), the regulations at issue in *Abdul–Wadood* did not create a liberty interest no matter what the prison officials' purpose.

We are free, then, to hold that regulations of the form "The warden may do *A* for any reason, but if that reason is *M* the warden must prove *M* before acting" do not create liberty or property interests. We should do so not only because federal courts generally should leave to prisons the granting and withholding of amenities (the question reserved in *Thompson*) but also because no promise in this form creates a legitimate claim of entitlement. Either of the contrasting positions advocated by my colleagues uses the due process clause to achieve federal enforcement of state law.